Thank you, your honor. May it please the court. I'm Braun Rammel on behalf of Appellant. Our client, Carrie Harmon, is a respectable citizen and business owner in Pocatello, Idaho. She was injured as a result of the unconstitutional actions of the Pocatello Police Department and some of its officers. Our primary issue on this appeal is that the district court adopted the defendant's version of the facts, passing over the plaintiff's testimony and evidence, and also making several improper material inferences in favor of the defendants. The facts as told by Ms. Harmon and her witnesses, especially when all reasonable circumstantial inferences are taken in her favor, demonstrate significant civil rights violations actionable under Section 1983. Ms. Harmon believes that the district court's legal errors generally flowed from this first misstep, though there are a few exceptions identified in our briefing. Starting with the malicious prosecution claim, because that's really where everything started in this case, Carrie Harmon did not commit any crime. There was no basis ever to reasonably argue that probable cause existed to obtain a warrant against her any time between October 15th and March 2016. A warrant was issued for Ms. Harmon's arrest nevertheless when Pocatello Police Officer Wright, following Pocatello Police Department policy, personally went to the chambers of Magistrate Judge Stephen Thompson and presented him with an affidavit of probable cause, attesting among other things, quote, I have conducted an investigation, end quote. And, quote, based on that investigation, end quote, I request probable cause to arrest Harmon for telephone harassment under Idaho Code 18-6711. Well, as we identified to the court in briefing, that law required that Harmon telephoned another and knowingly made false statements concerning injury, death, disfigurement, indecent conduct or criminal conduct of the person telephoned or any member of the family with the intent to terrify, intimidate, harass or annoy the person. Mr. Ramo, could I ask you a quick question? Yes. On this issue of malicious prosecution, is a prosecution itself a necessary element of a malicious prosecution? I'm sorry? A prosecution as opposed to an arrest warrant? It's my understanding that it is, Your Honor, and in this case there was in fact a If we agree with you that Officer Wright made a false statement, can you explain how you show that he had the necessary intent to deprive your client of a constitutional right? I'm wondering how we can tell from the allegations here that it was actually an intent rather than just an error that he made accidentally or something. Thank you. Yes, I think there's two components to that. First of all, remember that a reckless disregard of an act is, you know, is evidence of malice. It's one of the standards as well, and I think that in this case we certainly have that. Additionally, if you look at the history of what happened... How do we certainly have that? Can you just explain a little more how we know that? Yeah, I think that, for example, we've got two primary issues. First of all, the affidavit with the report to the judge that says, I've read and I'm familiar with all the contents in this report, and yet the most salient material document, the text messages that showed that Harmon hadn't even been communicating with the alleged victim but with a person named J.D., by filing that with the court, with the report, it infers that there's something in those text messages that illustrate the evidence required by the statute. But in fact, those reports, not the reports, excuse me, those text messages were never attached. And so we have this dangling inference combined with the officer's personal appearance with the judge that would give, I think, any reasonable judge the impression that there must be something in these text messages that the reports referred to while at the same time omitting those reports. And so, you know, from my perspective, I don't see how this is different from what happened in Frank's and in Davis, where the officer said that he had interviewed a person that, in fact, he hadn't interviewed. You know, I believe it's a distinction without a difference. I don't see how it's material. Getting back to Judge Gould's question, was the arraignment the prosecution? Can you tell us a little bit how much prosecution happened? Yes. So what happened was, after all of the events associated with the arrest, then Harmon agreed to go down to the police station the next day. She went down. At that point, you know, they still hadn't located the warrant, frankly, but at that point, she was presented with the charging document. A prosecution commenced, and she had to defend herself. Greg May ultimately brought a motion to dismiss. The warrant was quashed. Again, all associated with those events, the warrant was quashed, and the case was then, you know, dismissed. Were there any court proceedings in between the arraignment and when it was dismissed? Yes. Discovery and multiple pretrial conferences. The prosecutors originally did not want to dismiss. If you look at the deposition of Greg May, you'll see that, in the record, you'll see that Mr. May had pointed out to the prosecutor at least four things. The main one was text messages not only couldn't meet the specific intent element, but weren't even directed to the alleged victim to begin with. Am I right that the malicious prosecution claim is really just against Officer Wright? Yes, except that I believe it's a violation of, I believe that the Ocadillo Police Department policy is what created that whole mess to begin with. You know, we talked... You have the Monel version of it, but not the other two officers, right? That's correct. Yes, yes. No, we're not asserting that the other officers maliciously prosecuted her. That would be on the separate claim. All these people are interconnected, frankly. Nicole Inslee is Ms. Harmon's granddaughter. Harmon's had taken care of their child for a long time. It was their granddaughter. That's what gave rise to much of this. And sorry, that's in the record, but not briefed. And so, you know, kind of focusing on that, you know, two things that I think that, based on the evidence that I identified or picked up on, you know, Officer Wright really did, in his deposition of the transcript on 193, he was asked specifically if he had done the investigation. He said that he had done in his affidavit of probable cause, and his answer was that, you know, well, I asked him, so that's really not accurate, is it, that statement? And the answer was, as far as it goes, no, I did not conduct the investigation. So, there's no material difference, I should say, between falsely saying you've interviewed someone and saying that you conducted an investigation when you haven't, or saying that you've read a report when, in fact, you haven't. And what is the evidence that the Police Department policy encouraged him to make this misstatement? Thank you. So, when Officer Daniels was deposed under his 30B6 deposition, so was the representative of the entity, here was what his testimony was. He explained that the day shift corporal, or the officers, would take the report down to the judge after they reviewed it to make sure there was probable cause in the report. Because the judges wanted somebody right there in front of them with this affidavit, and the person that provided that affidavit had to be the person that was handing it to the judge. That's in the record at 2 a.m. So, I read that, but that doesn't say, and the person who goes on the day shift instead of the night shift has to lie. I mean, they could just bring the affidavit and say honest things about it, and explain that someone else investigated. So, where do we have the idea that they were encouraged to lie? Well, because they knew, I think they clearly knew, when the judges had told them that they wanted the person with personal knowledge, basically, to be there and be there. Personal appearance means something. And so, sending an officer there, what's the point of having him personally appear if it's not to represent that he has some kind of personal knowledge? In fact, he ends up averting in his affidavit that the contents of his affidavit are true to the best of his knowledge. Well, at a minimum, that implies some knowledge. And yet, from his information, he has none. And so, if the Pocatello Police Department knew that this was what was expected, then sending an officer to the department that had no such knowledge would certainly be an encouragement to have people go that didn't have that information. I mean, they knew they didn't have information. Now, I agree with you, Judge Friedland, that they could have done things differently, but as was stated multiple times in the record, this was the way it was done. Officer Wright testified to that, and Officer Daniels testified to that. Wasn't it because they have different shifts and night people and day people? It was. And as Judge Friedland stated... Is there something in the law that says a person has to be there, or is there an affidavit or writing that's sufficient, or a report from someone who knows what happened or was told what happened? It seems to me the police department would be shackled if they had to have these people all coming in to a judge in order to get this. I mean, that isn't the way that usually works, is it? No, and I agree with you, but consider the difference again. Just like as in the Davis case where the court said, look, all he had to do was tell the truth here, say that he wasn't the one that conducted the interview. In this particular case, collective information is fine. It's just that when you're going to have or ask a judge to rely on that collective information, you need to appropriately identify that collective information. You can't say I did an investigation or I did a report, or that I've reviewed documents that you haven't reviewed. And again, the problem that we have is that every officer that testified said that what Officer Wright did was pursuant to the Pocatello Police Department policy. Well, did anyone testify that misstating his role was pursuant to policy? No, I think of course not, Judge Friedland. I don't believe that anyone would say that, but clearly if you're saying that what this officer did was fine, and you read the report, I don't see how those two things are not connected. If the 30B6 representative of the city says that what he did was fine, which incorporated and included all of the material misrepresentations, and the he said he hadn't, or excuse me. Well, is there a question? I'm sorry, I don't remember a question like that. I'm sorry? I don't remember a question like this is a false statement. Is that fine? That's correct. I did not ask that. Yeah, I just think that the connection is that for some years they had done this, and by the way, you know, it gets a little bit tricky, but I think the fact that Officer Daniels acknowledged that they had changed that policy and no longer did it, and then remembers a 30B6, he says that he doesn't know why they changed the policy. I think that a minimum and inference for the jury would be that the Pocatello Police Department knew that what they were doing was improper. They knew they were sending people to a judge that at a minimum implied that they had information and implied that they were doing things that, in fact, they weren't doing. Does that answer the question? Looking at the District Court's factual errors then, and I think this goes directly to one of the earlier questions, you know, the District, looking at the factual errors from the court, one of the glaring errors the District Court had was that they found, quote, not only was she not arrested on either charge as well, she was merely investigated. That's the excerpt of the record of 88, and of course, as we talked about, you can look at excerpt of the record 318. That's the Reg May deposition that talks about how that she was charged, forced to defend herself, the warrant was quashed, and ultimately the case was dismissed after, you know, after multiple proceedings. Would you like to tell us a little bit about your excessive force claim? Yeah, thank you, Your Honor. I think that, starting with the lie that the excessive force is ordinarily a question of fact for the jury, and that's really what we want to get at here. Nevertheless, the District Court in this case found that the use of force on Ms. Harmon was minimal as a matter of law, and also that her injuries were minimal. I, you know, we submit that only the defendant's testimony and point of view could lead to that conclusion. You know, two months of additional medical treatment alone be like both findings. You fed us a really force, leading to the actual force. If I understand the record correctly, there was a grabbing of her wrist. That's correct. And the grabbing of the wrist resulted because she was going to depart and the police officer wanted to arrest, and there was a, and there wasn't anything more. It's just unfortunate your client had a problem with her wrist that was existing, and I understand, a brace. But there was just this moment, momentary stopping her from moving back. That, that is, is there anything more to it than that? Yes, with respect, I don't believe those are the facts. If you recall from Ms. Harmon's deposition, she was speaking to the police officers and suddenly, without warning, yeah, so she wasn't retreating. Suddenly, without warning, Officer Bloxham reached into her house, grabbed her splint, the arm with the splint, and began trying to yank her out of the house. So at that rate, at that rate, at most what you have is an arrest. Yeah, you certainly have a seizure by entering into the threshold and pulling on a medical splint that they knew existed under her version of the facts. But at that particular time, wasn't there an event, a valid arrest warrant, or valid, or whatever, arrest warrant occurring that had been, that had been developed, right? There's, well, there's two parts to that. A valid arrest warrant, no. Did the officers... Is there an arrest warrant? There was. And so, if so, if the only, if the only problem is that there was an arrest made, the arrest was pursuant to that arrest, could be pursuant to that arrest warrant, correct? It could have been, if you believe the officers' testimony that they were actually aware of the warrant. We believe there's sufficient information in the case to at least create an inference that they didn't know that that warrant existed. What do you, what do you, on what case do you have that they have to know that there's an arrest warrant? That gets us into the whole issue about Idaho law and the federal statute that talks about that an officer's must do multiple things. They have to show the arrest warrant, and under at least the federal rule, just kind of shortening the under the federal rule, if they don't have the warrant, they can do it later. Under Idaho law, it's very clear that they're required to present it at the time or else they've engaged in an improper arrest. What is your Idaho case that says that specifically? Two cases. There's Anderson v. Foster, which is in our briefing, and there is Sprague v. City of Burleigh, and they both specifically address the Idaho statute, perhaps most significantly, Idaho Code 18-609 specifically talks about that they've got to show the warrant. And so federal, remember under the federal... You say that Virginia v. Moore tells us that we have to look to state law to figure out whether there was a problem with the arrest, but doesn't Moore say exactly the opposite? It says we don't look to state law? That's a bit of a complicated argument, and so I didn't go into it deeply, but frankly, I believe that if you look at that in context of the N. Dyeri case, you see that what happened was that the court found that arrests were governed by state law. That's the opposite. I mean, the Supreme Court said neither in DeRay nor the cases following it did anyone hold that the violations of state arrest law are also violations of the Fourth Amendment. Yeah, I'm aware of that, but the distinction there, as we tried to point out in our briefing, is that there's a difference between warrantless arrests, which are what in Dyeri and Virginia v. Moore dealt with, and arrests under a warrant, which are governed by the different doctrine under the standard of an arrest with a warrant that has never been, you know, that that particular issue has never been changed or overruled. The court said when states go above the Fourth Amendment minimum, the Constitution's protections concerning search and seizure remain the same, so you're saying that principle doesn't apply to warrants? Because I believe that the case itself says that the warrant arrests under warrants are different, and of course, you know, directing a little bit, I think if you look at the Anderson v. Foster and Sprague cases in conjunction with the Idaho statutes, which clearly would put these officers on notice of their obligations, those cases both found specifically and expressly that violating, that not failing to show or produce the warrant when requested and failing to inform the charges in the nature of them, none of which were done here, were violations of the Fourth Amendment. Okay, Mr. Rammel, I'm just going to note that it's entirely appropriate for you to answer fully to any question posed that I've appreciated, but you are, you're five minutes, initially a lot of time, so I'll give Mr. DeVos some extra time if he wants it, but I also wanted to ask you if you had anything else you absolutely needed to say to conclude your opening argument. I'll give you two minutes of rebuttal no matter what. Thank you. Let me just hit to one specifically because in terms of the seizure and the excessive force, you even with a warrant, I think if we look at Hodari, I don't understand the district court's reasoning on this because I think Justice Scalia and Hodari was pretty clear, even gave an example of circumstances in which excessive force was inappropriate. He talks about Justice Scalia, I'm sorry, after Justice Scalia explains that, quote, the word seizure readily bears the laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful, and then it talks about his example is, for example, quote, she seized the purse snatcher but he broke out of her grasp. In this case, one could equivalently say that Bloxham seized Harmon and that she broke out of her grasp. Well, if that's the case, if there's a seizure, then at that point, the question becomes, was the force, the most minimal force necessary to accomplish the purpose, grabbing a medically prescribed brace that the record would show, according to her set of facts, they knew or had to know existed there and to yank on it to pull her out of her house, even if there had been a valid warrant, was in violation of the Fourth Amendment, Your Honor. Thank you, counsel. I think we've got your argument well in mind and we thank you for that. Now, I'm gonna now give Mr. Hall probably more time than he needs or wants, but I will give you a rebuttal time afterwards. So, for planning purposes, just plan a two-minute rebuttal. Mr. Hall, I think we initially set this for 15 minutes per side, you know, because our questioning took up a pound over the time. You can feel free to argue for 25 minutes if you want. You can wallow in the extra time, but you don't need to use it. Thank you, Your Honor. My represent the Appalese City of Pocatillo and its various officers. My hope, actually, was to not take the full 15 minutes, but we'll see how this goes. I'm going to start at an area that counsel seemed to spend quite a bit of time discussing, which was the Moneo claim. And counsel wants to take the position that that there was some policy that is somehow a constitutional violation when an officer relies upon another officer's report for the purposes of going before a magistrate to obtain an arrest warrant. The United States Supreme Court has already indicated in the United States v. Steed that officers are permitted to rely upon facts learned from their fellow officers to prepare a truthful affidavit. And additionally, in United States v. Davis, the 9th Circuit stated that Thomas could have relied on the facts learned from his subordinates to prepare a truthful affidavit. That is exactly what occurred in this case. Part of this investigation occurs through... You started saying you were arguing about the policy, the Moneo issue. So you might be saying that there was no policy to lie, but I don't understand how you can avoid the idea that Officer Wright said something that wasn't true. Well, I don't believe he actually said something that wasn't true, Your Honor, in that if you look at Officer Wright's affidavit, he correctly stated in his affidavit that another law officer had prepared the report that he was providing to the magistrate to provide a basis for probable cause. But he said that he investigated, and he didn't. Well, I guess that turns on what the word investigate means. If it requires you to have firsthand... He didn't look at the text messages that were the source of the allegation, did he? It is true that he had not seen the text messages, and his investigation was simply to review the report of a trusted co-officer, which he clearly believed was truthful in providing information to him. But that's not an investigation in any normal sense. I mean, to just perhaps read what a that's not usually the meaning of an investigation. Well, I think different people can reach different conclusions as to what would constitute an investigation. If I'm a supervisor, and I am involved in reviewing the reports of a number of my subordinates, I would conclude that I was involved in investigating this action. So for example, we might have a murder case that has 25 different deputies or police officers involved in the and actually conducting any of those interviews. But if I am reviewing every one of those activities, I think it's fair for an individual to say that I'm engaged in this investigation. Perhaps so if you're like looking for themes that are emerging from the interviews and finding things between them and actually adding some thought to the process. But there's no indication that Officer Wright even digested what was going on here because he didn't even notice that there were no attachments with the text messages. He indicates that he read the any he clearly indicates that he read the investigative report. And he provided that investigative report to the magistrate. Now the magistrate as well, even though it's referenced in there also didn't notice the absence of those text messages. But this is not a anything other than an inadvertence oversight on the part of Officer Wright. This isn't any nefarious effort on his part. He thought he had everything. He took everything to the magistrate. He remained at the magistrate's office to allow the magistrate to review everything that he had and to respond to any questions the magistrate might have, which was the policy. That is to say that the whoever was presenting the affidavit of probable cause was required to remain at the courthouse until the magistrate had reviewed everything, could ask questions and get responses if necessary, before they are required to make a determination as to whether or not probable cause existed. That's exactly what occurred in this case. And certainly, in good faith, Officer Wright believed that there was probable cause and presented everything that was all of the material that had been provided. Also, I believe in good faith, but who has the judicial responsibility of making an independent determination as to whether or not probable cause exists, made that determination that in fact, probable cause existed, and thereby issued the arrest warrant. I'm going to turn now, briefly, if I can, to the issue of what I think counsel spent some time discussing with regard to malicious prosecution. As Judge Wallace held in Freeman v. The City of Santa Ana, the mere fact that a prosecution is unsuccessful does not mean that it was not supported by probable cause. In this case, it is clear that the magistrate originally determined and believed that there was probable cause, and then an independent prosecutor made the determination as they pursued this case that there was probable cause. Ultimately, they decided to dismiss the claim, but that in and of itself does not demonstrate a lack of probable cause. We can evaluate that at this point, right? And the text messages are to someone named JD, not to the person who allegedly was being harassed. So how do you get around that? Well, I think with regard to the defendants in this case, Your Honor, that you get around that by no other means. The fact that they were proceeding with what they believe was a valid arrest warrant, and that they were actually trying to argue that there really was probable cause. So how do you explain how there really was probable cause? Not what they thought, but how we should decide that there really is probable cause based on these text messages that are to a different person. Well, I'm appalled, I apologize that I do not have at my fingertips the ability to give the court an adequate answer. My belief is, is that based upon the information that was in the police report and the investigation interviews that had occurred, that a magistrate concluded there was probable cause. And the officers, based upon reviewing that report and taking that report to law enforcement, believe there, or to the court, believe, in fact, there was probable cause. The officers at the scene had every reason to believe there was probable cause because an arrest warrant had been issued. And in this case... But I don't think he's bringing malicious prosecution against the officers at the scene. He told us that today. So for malicious prosecution, the only issue is Officer Wright. And if he's surrendering his claims as against the other officers, I'd be happy to focus on that issue. In this case, there were two complaints. One is the Hughes complaint. The complaining officers were investigating that Hughes complaint, and Harmon was never cited on the Hughes complaint. On the Inslee complaint, that is a previous complaint for which the arrest warrant was issued. And in that case, Your Honor, it appears to me that the underlying court, Judge Nye, held that, moreover, even if Harmon had alleged... First of all, he concluded that there was never, ever a claim brought under the pleadings for malicious prosecution. We would submit to the court that that is accurate. There was no such claim brought under the lengthy decision went on to hold that even if Harmon had alleged a claim for malicious prosecution, which stemmed from her prior charge for telephone harassment, stemming from the original arrest warrant in the 2015 case, as it will be explained in greater detail below, she cannot establish a lack of probable cause. That's at the record on page 86. So the district court specifically looked at that issue. The district court clearly addressed both complaints against Harmon correctly, finding that no prosecution occurred with respect to the Hughes complaint, and that probable cause, in fact, did exist with regard to the Inslee complaint. The district court also found that in any respect, the officers would be entitled to qualified immunity on the malicious prosecution claim, including Officer Wright, who in good faith presented to the magistrate court the full report that he had, everything that he had and was aware of for the purposes of obtaining, establishing probable cause and obtaining an arrest warrant. On the question of whether the complaint alleges malicious prosecution, isn't that paragraph 112, where it says defendants acted under color of state law, including but not limited to prosecuting Mrs. Harmon with malice and without probable cause? Officer Wright, who's the only individual that they're bringing that claim against, was not involved in the prosecution, either the decision to bring the cause of action an independent prosecutor made that decision. And certainly, you cannot establish any malice or bad faith on his part, because all he is doing is presenting to the magistrate the night, the investigative officer, the night shift officers' report and information relative to this investigation. And the magistrate is the individual who reviewed that and made an independent determination of the fact that there was probable cause based on that information. But maybe the magistrate judge thought that because Officer Wright was saying he investigated and the judge trusted Officer Wright, that that's why there was probable cause. Except that Officer Wright, in his affidavit to the magistrate, specifically indicated that he was presenting to the magistrate information that had been prepared by a fellow officer. He stated that, in his affidavit, that another law enforcement officer had prepared the report and provided the basis for the probable cause. He did not indicate that that was coming from him. He said, I have conducted an investigation regarding Carrie Harmon. Based on that investigation, I request a determination of probable cause to arrest. In the Supplemental Experts of Record, at page 18, he stated that, in his affidavit, that I further depose to say that I have read Exhibit A, and all the contents are true to the best of my knowledge, that I personally know the author of the report to be a law enforcement officer whom I believe to be credible and reliable. Couldn't it be true that Exhibit A was written by an officer who did part of the investigation, and Officer Wright did another part of the investigation? And all those statements could be true, but in fact, they weren't, because only only the other officer investigated. Again, I realize that we have a quibble. We differ on our conclusion as to what constitutes an investigation. His investigation, as he indicates, and I believe in his affidavit, is based upon what he learned from the report that he was attaching, which he clearly identifies to the court, was being, was conducted by another officer, rather than by himself. He indicates it, and you can look also at the Supplemental Experts of Records 13 and 14, where he indicates that he was the day-ship corporal and was provided a copy of the police report prepared by a night-ship officer. And so, there's no misrepresentation to the magistrate as to what, who had prepared the report and information that was being provided to the court for the purposes of determining whether or not there was, in fact, probable cause. Finally, Your Honors, if I may talk just briefly on the issue of whether or not there was an arrest here. In fact, Judge Nye did a fairly lengthy evaluation of this case, contrary to representation by counsel, that any facts were construed in most, in a light that was less favorable to the plaintiff. That page, that excerpt of Record 72, Judge Nye specifically indicated that the broad, that he has the broadest possible base to support her claim, construing all facts in the light most favorable to her, and goes on to say, at excerpts of Record 77, that Harmon does not cite to an affidavit or to any specific evidence to support her It is also clear, as Judge Nye concluded at the excerpts at 85, that at no time was physically or by yielding to a show of authority of the officers, Watson never restrained Harmon's movement nor her liberty. And in fact, it's clear that she left the front entry area of her home. The officers didn't pursue her into the home. She went upstairs, called her attorney, came back down, handed the phone to her husband, then went back upstairs and went to bed. At no time could any reasonable individual come to the conclusion that they were seized or somehow being detained. Finally, that counsel has seemed to argue that Idaho law, rather than federal law, controls with the issue, with regard to the issue of the warrant. I would submit to the court that the court has correctly identified that that's an error. In this case, there were no state law claims brought, only federal constitutional claims. And under Idaho rule, Criminal Rule 4, you're not required to show a warrant before you arrest an individual. And we've cited that information in our record clearly. I'd be happy to respond to any other questions the court might have. I have no questions. I think we don't. I will thank Mr. Hall for his argument. And Mr. Ramo, we've given you some extra time. Three minutes, so. Mr. Ramo. Turn your microphone on. I'm sorry. Thank you. Go ahead and prove it. First of all, what Judge Nice said he did and the standard he recognized was vastly different than what he actually did. For example, the excerpt that Mr. Hall referred to, where the judge said there was no evidence in the record to support Harmon's claims, actually is inaccurate. And to save time, I would simply point you to our briefing on that point, where we identified a significant amount of information, testimony that was provided to the court that, in fact, did support her inference. Second of all, just briefly, the additional policy claim, even if you don't accept that Virginia v. Moore makes a distinction between warrant and warrantless documents, the bottom line is the city of Pocatello had a policy that trained its officers to violate the statute, which is codified in Rule 4 of the federal rules, which requires officers to inform the people of an arrest before they arrest them. And that, of course, is consistent with the Idaho statutes. And it's also absolutely consistent and expressly stated in the Idaho cases previously mentioned in Anderson v. Foster and the Sprague case. And so, in that sense, the city of Pocatello had clearly instructed officers to ignore the express statements of the rules, including Rule 4, which says they're required to inform the person of the charges at the time and before arrest. Can I ask you how you deal with the case from our court, United States v. Hernandez, which says that if someone is essentially tackled and gets away, they're still not arrested? Yeah. So, the main difference is that Hernandez did, in fact, get away and ran. Connecting that in, because the two things kind of merge into the excessive force concept, in the sense that one of the gram factors is whether or not the person is a danger. And at least one court says that's the most important factor. Well, unlike Hernandez, Harmon had nowhere to go. The officers maintained contact. They stood outside of her door at all times until an arrangement was reached. There was absolutely no concern that Harmon posed any threat of safety to the officers. Well, that's not the excessive force, but I'm just wondering about the arrest itself. So, in Hernandez, our court said if the person gets away from the grab, they're not arrested. And it seems like your client got away and went inside. And the distinction is she really didn't get away. I mean, like cases like Bostick and U.S. v. Washington, where the person was trapped in an apartment or a bus, it's the same thing here. He grabbed her. And if you want to say getting away, I think that's an inference that actually adopts their version of the claim as well as the facts. Because recoiling in pain is not the same as fleeing or trying to get away. Yeah, she was able to extricate herself from the grasp, but that didn't mean she got away. And unlike Hernandez that ran away, threw his gun away and then disappeared, Harmon was stuck in a position just like on a bus or in an Washington and the other cases. I've taken even more time. I appreciate it. I suppose—am I past my time, judges? Yes. Okay, we briefed it. Thank you so much for your time. Thank you. I want to thank counsel on both sides of the case for their strong, cogent, and excellent advocacy. Both of you make me reminiscent of being in private practice as an advocate instead of wearing the black robes. I just want to know if there's something in Pocatello, like in the water, that makes people know how to be advocates? Because I recall back more than 30 years ago, I had to tangle with now-judge, then-lawyer Randy Smith, when both of us were advocates. Yes. And he's a dynamite advocate. And I just wonder if he gives—it was tutoring, tutoring both of you and others in Pocatello. He is absolutely awesome. Dealt with me many times and knowing very well personally. Very close friend of mine. Great attorney. Great judge. Great. Well, again, thank you both. And unless there's questions from Judge Wallace or Judge Friedland, this case shall now be submitted and the parties will hear from us in due course. Thank you so much.
judges: Wallace, Gould, Friedland